Good morning, Your Honor. I'm Krista Hart on behalf of Willie Wilson, arguing with Mr. Ballas on behalf of Mr. Gadson. Our goal is to argue six minutes apiece, reserve three minutes for rebuttal. Okay. May it please the court, counsel. In this case, Officer Thompson was allowed to testify as a lay witness. He was never qualified as an expert. Based on this lay witness, lay opinion testimony, he gave what is arguably an opinion about the overall aspect of the case, the overall result of the case. He testified about his opinion as to what was said during the jail calls. He acted not only as... But the jury heard the actual tape, right? Well, yes and no. He indicates in his testimony that he listened to over a hundred hours of telephone calls involving Mr. Wilson. Which part is no? The jury didn't hear the tape? They heard very small portions. So of these hundred hours of telephone calls, the jury heard portions of eight calls relating to Mr. Wilson and small portions of five calls relating to Mr. Gadson. But he testified that he listened to hundreds of telephone calls and that that somehow imbued him with an ability to determine what they were talking about. But he didn't talk about any calls that... Oh yeah, he specifically talked about calls. He specifically testified about... Here, let me just finish my sentence and maybe you'll answer the question I was actually asking. Okay. He didn't talk about any calls that he didn't actually hear, right? He was talking about the calls that they were actually hearing, right? Well, not specifically, but he referenced them. For example, at one point when he says, Gabriela Hayes, she goes by the nickname of Gay because we've ascertained that from other phone calls we've listened to. So while he doesn't go into the specific details of each other... So what was the objection there? Hearsay? Yes, that would be impermissible hearsay. It's also, it's not proper lay opinion testimony. Because here, Officer Thompson was never qualified as an expert. So this is basically an individual coming in after the fact, reviewing all of the government's evidence and saying, this is my opinion about what the evidence says. My impression is that there's a range of legal rulings in the circuits about this kind of evidence. It actually comes up fairly frequently, and there was a recent D.C. Circuit opinion, and that the Ninth Circuit case law seems generally to accept this sort of thing. How would you, given the Ninth Circuit case law, how would you distinguish them in our cases? Well, this case is different because the Ninth Circuit case law that's relied on by the government, which I think is Freeman and Reed, which is cited by the government, both of those cases are easily distinguished. Freeman was, the officer was qualified as an expert and as, he testified also as a lay opinion. They ruled that some of the testimony that came in under the lay opinion side was impermissibly admitted, but was then ruled harmless. But the difference there, another difference there is that that involved a wiretap, where the agent was contemporaneously listening to what was occurring, and therefore learning about the investigation as it went along. Versus here, where we have Officer Thompson, who's going back historically and giving his opinion about what things mean based on evidence that occurred after the phone calls. Now, in a lot of these cases, the what things mean is sort of coded language. And he did a little of that here. Correct. But there were other things, too. I mean, sort of references about what pronouns meant. I mean, do you have any examples that would be helpful in terms of... Sure. And then maybe you should get back to Reed, too. Why is Reed different? Well, Reed doesn't really go into any great detail. In Reed, the officer testifies as an expert, and they just merely reference Freeman, but there's no real analysis concerning Freeman. But, for example, you know, numerous times during the testimony, the government specifically says, you know, I can't understand what's being said, officer. Can you tell us what's being said? And that's said at Excerpts of Record 518, Excerpts of Record 552. And then another instance would be Excerpts of Record 557, where initially in his notes, Officer Thompson says, believes that what is said is the word toting. He's toting him out. But then after he views other evidence, he goes back and changes that and says, well, now I think it means choking. He's choking him out. And then the jury asked to be able to listen to the original recordings of these phone calls, but that wasn't available because none of this was preserved. The phone calls weren't, they didn't have the tapes? What they did in this case was they had the recordings, but all they did was they played portions of them during the testimony. So there was no disc, there was no statement that was entered into evidence. So in terms of our record, this is one of the things I've been trying to figure out. We don't have a transcript. Correct. Do we have a tape? Here in Alaska, instead of having court reporters, they have audio recordings of all the proceedings. That's all we have is a CD of day five of the audio recordings. And I've listened to it. It's very difficult to understand. During deliberations, the jury asked, we'd like to hear the original recordings because these are hard to understand. They weren't able to do that because none of the record had been preserved. There was no disc, there was no recording other than the courtroom recording that they could give to the jury. How did the jury hear them the first time? How were they played? Just sitting in the courtroom when they were played over the general system here in the courtroom. I don't think you understand my question. How did the sound get generated in the courtroom? Was it a tape recorder, MP3 player, computer? That's not part of the record, so I don't know the answer to that question. I know that they were played over the system, what they refer to generally as the court system, which Agent Thompson indicates is not playing it, as well as what he could hear in his super quiet room with his headphones. Are you saying that this is a violation that the district court erred in admitting this as lay opinion testimony under 701? What exactly is your argument here? Yes, that it was erroneously admitted under 701, lay opinion testimony, because Officer Thompson relied on numerous things that's not permissible. For example, Brandon Haynes' statement. He, on numerous occasions, indicated things like, well, we have audio, video recorded statements of Brandon Haynes. They lasted several hours on multiple occasions, insinuating that Brandon Haynes has corroborated all of this evidence. Your argument in some ways is broader, it seems to me, than simply whether it's lay testimony or expert testimony. There was an interesting dissent in our concurrence in the recent D.C. Circuit opinion where Judge Janice Rogers Brown says there's a bigger problem here. You're taking this whole issue away from the jury, and it seems to me that's essentially what you're saying. Well, it is. A number of the claims within our argument, our brief, dovetail together. The fact that Brandon Haynes made a statement, that violated the Confrontation Clause, that was impermissible. But that's a separate claim, but it dovetails with this. I didn't understand that aspect of your argument about Brandon Haynes, because the, I guess it was the officer, didn't give any content of that. He just said, this happened, he made admissions to the police, but didn't give any of their content. So it wasn't clear to me why that was either hearsay, because there was nothing that was admitted for the truth of the matter asserted, or a Confrontation Clause violation, since there was nothing testimonial. So maybe you could address that, since you raised it again. Well, what this does, is this imbues, all these things imbue Officer Thompson with an air of credibility. And basically he's saying, look, I have reviewed all of this evidence, I know a lot more information than you do, jury, and take my word for it, this is what these things mean. And so what does that violate specifically? That's because that's for the province of the jury to determine whether... They were told that it's their decision, they were told that to be guided by the tape, not by what the officer says. So why isn't his opinion just as good as anybody else's opinion? Because a lot of that is, it's impermissible hearsay. Like that wouldn't be allowed under other... Was there a hearsay objection? I believe there was. Could he have played, what if he had actually played... The other parts of the tapes that he was relying on to the jury? Like the audio-video recorded statement of Brandon Haynes? Well, no, the other parts of the tapes from which you were surmising who was saying what about what. I still think there would be a problem. I think it becomes a problem when you have an officer who, by his own admission, by saying that I have all of this extrajudicial information at my hand and my interpretation of the phone call is this. What the interpretation of the phone call is, is for the jury. And I really went past time, and I have less for Mr. Ballas. I don't... I'm sorry. Good morning. John Ballas on behalf of Anthony Gadsden. I do want to address two issues. The denial or the exclusion of Brandon Haynes' exculpatory testimony. But before I do, I want to follow up on one point of my co-counsel of the egregious error in this case where Officer Thompson, during his testimony, also testifies that he put together a good case and he's confident of the guilt of the defendants. That's clearly in the government's conceded error here, but it's particularly prejudicial and requires reversal in the circumstances of this case for a number of reasons. It's hard to get too excited about that. I mean, he didn't say, I know something outside the record that tells me this. He said, I put together a good case, essentially, and I've shown it to you, and I think it's guilty. And why is that going to impact the jury? It's particularly critical here because of all the additional information he keeps seeping into the record. That he listened to over 100 phone calls, that he's reviewed the police reports. Well, I think all that may have problems, but I don't know about this statement so much. And he also specifically, it's at the government's supplemental except the records at 11, he tells the jury that he has statements from co-conspirators placing Gadsden at the residence and providing cocaine to them. That never came out at trial. And he tells it to the jury, and then he tells... In what context does he tell it to them? Well, it was during cross-examination, and defense counsel asked about what kind of physical evidence he had linking Gadsden to the Fouts residence. And he kind of blurts out again, as he was doing continuously, not really answering the question, and putting a lot of prejudicial information into the record. My other issue that I want to address is the district court's exclusion of crucial exculpatory testimony from co-defendant Brandon Haynes. And that's a violation of both the federal rules of evidence and the statement against penal interest, as well as a constitutional right to present a defense. And the main statement that defense counsel tried to get in was that Brandon Haynes had told the defense, told the defense investigators and the prosecution team, that he was the one who put the $38,000 of cash in the garage at Gilliam Way where Anthony Gadsden lived, not Anthony Gadsden. That was really a crucial piece of evidence because it was the only evidence really linking, physical evidence kind of linking Mr. Gadsden to the whole drug conspiracy other than all the officer's testimony and the co-conspirators, the cooperating witnesses. But there's a rule. The applicable hearsay exception requires clearly corroborating evidence or something to that effect. Or at least allows the district judge to not admit it without it. So what's the problem? Well, I think that the arguments here not only are crucial, but they are shown to be reliable and sufficiently trustworthy for a number of reasons. One is it was made directly to the prosecution team under circumstances where it was in his interest to cooperate and implicate Mr. Gadsden to get a lower sentence. And instead, he tells them that, no, I was the one who did that. Mr. Gadsden didn't put the money there. They didn't believe that. Was that before or after he already had a plea agreement? That was after his plea agreement, before trial, during debriefings. Before he had a sentence? Before he was sentenced. He was later sentenced after the trial. Brandon Haynes is Mr. Gadsden's half-brother. He had access to the shared garage. He was recorded in a prior phone call saying that Mr. Gadsden... So how is this against his penal interest? Because it subjected him to further potential greater punishment because he was awaiting the government's recommendation on a 5K motion to reduce the sentence based on his cooperation. And instead, he was telling them things they didn't want to hear and they didn't believe. So that's one. Also, they could potentially have charged him for perjury or false statements because they did not believe what he was saying. So some cases have looked at the relationship like a father-son or relative to undercut trustworthiness, saying, well, a brother might have a motive to make it easier for his brother. Why wouldn't that be relevant here? I think that could be one factor. But in the totality of all the circumstances here, I think the statement was potential... It was a half-brother. But given all the other factors that I listed in my brief, I think the statement is sufficiently trustworthy. Thank you. Okay, we'll hear from the government. May it please the court, I'm Kirby Heller for the government. Excuse me. Let me start with the tape and the testimony about the tapes. And there's just one preliminary point I'd like to make, which is distinguish between the admission of the tapes and the admission of Investigator Thompson's testimony. There were some challenges to the admissions of the tape. They were objected to on foundation grounds and that there was some hearsay admitted through them of the co-conspirators. And at one point there was a relevance objection. But there were no objections to the testimony of Investigator Thompson improperly testifying as a lay witness, improperly testifying as an expert witness. So all of those objections to Thompson's testimony specifically is reviewed for plain error. We're certain of the testimony, and this goes to your question, Judge... Were there hearsay objections? I asked the opposing counsel and she said she thought there was, but I wasn't sure. When there was a general discussion before Investigator Thompson testified about the conversations, the defendants said, I believe it was Mr Wilson, I'm not sure, but said that they were objecting to the statements... They were objecting to them on hearsay grounds. They acknowledged that some of them were admissions, but they objected just in general to co-conspirator hearsay. And there was a discussion on the record about why the government thought that, first of all, they were co-conspirators, so it would come in as co-conspirator hearsay. Then, in one instance, when the recording was being played in which Brandon Haynes was conferenced into the call and Thompson was going to testify, let's say, as context about what was happening, there was an objection to that testimony. The objection was, and unfortunately the record is not entirely clear, Wilson's attorney says, and we object to Haynes, as we said before, is to hearsay, then there's something inaudible, and then the court says, we'll proceed. But there was that specific objection to hearsay as to that one part. What about this incident where the jury asked to hear the tape and began, and they are told it's not available? That's not my recollection of the record, Your Honor. There was a note, after they were deliberating, there was a note that said, we want to hear the jail calls, and then there was a discussion with the court and the counsel about how to do that, and then it was decided that the jury would come in by themselves, no counsel, no court, just with a court clerk, I guess, who would play the audio of the district court proceedings, just the audio, not any of the testimony. But not the tape, not the tape itself. Not the tapes themselves, it's true, the audio of the proceedings, which is the way that is preserved. Well, it's not usually the way these things are preserved. No, it's not. I mean, the whole thing is very strange. Usually we have transcripts. I mean, I feel like we can't really review this very well, because I can't figure out how... I have what the inspector said, but I don't really have what, for myself, what the tape says. It was very strange, Your Honor, I agree. Well, how am I supposed to review it in terms of whether what he said, his role was just too intrusive and too... If I had nothing to go by except what he said, which is his surmise about what the tape said, and I'm not talking about what he heard, which is a problem in itself, because you could hear different things on a tape, but also his own perception of what was meant by what was said, so that sometimes, as I understand it, they say, you know, they did this, and he says, oh, they mean so-and-so. Well, I can't even listen to find out whether that was prejudicial or not prejudicial, because I can't figure out what's on the tape. Well, the record of what was played for the jury, so the record in this case would be the audio... But apparently it's not very audible. I just asked him this morning about whether I can get it, and I will try to do it, but I gather you can't really hear it. I'm not sure about that, Your Honor. I actually did not listen to the audio of those tapes. I mean, more generally, why isn't the D.C. Circuit's recent opinion just right about both the majority opinion and the concurrence about the fact that this kind of testimony is simply usurping the role of the jury and exceeding the role of a lay witness and just shouldn't be allowed? Well, that's... The position of the D.C. Circuit is an outlier. It's even... That's not my understanding it's an outlier. My understanding is that there's three or four circuits that have taken that position, and that our position's somewhere in the middle. Yeah, I think the only other circuit that comes close, I think, to that specific decision is the second circuit. Okay, what's wrong with it, aside from being an outlier? It's not this court's position, and certainly I think that the reasoning is that a jury is going to hear certain words that are just used, say, in the context... I understand the part about, you know, coding, all right? But that's not what the... It's a little bit of what the issue is here, but it's not most of what the issue is here. And we have stated in our brief, Your Honor, that some of the testimony was not admissible under Rule 7001. We don't believe it was plain error, but it was not admissible. We think in this case, and for three reasons, but to directly answer your question before I go to the other two, you're right in that the main danger in a law enforcement officer giving his opinion about matters that are on a recording that the jury can hear for itself... And can't hear for itself very well in this instance. I'm sorry, Your Honor? Can't, in this instance, hear very well for itself. So it's likely to believe what he said. Well, some of it is clear. In fact, there are a couple of exchanges between the prosecutor and the witness where the witness, in fact, says, we can let the jury hear this, it's pretty clear, and then there are questions about it. But he also claimed to have been some expert in being able to hear better. I mean, that he was in a special room, he had better earphones. Why didn't they have the better earphones? Right, well, that would have been better. I'm not sure that that actually is inadmissible under 701. It's certainly unusual, but it certainly fulfills the requirements. It is something that's based on his firsthand perception. It is helpful to the jury, and it's not based on scientific evidence. Well, it is based on scientific evidence. Well, not the kind of evidence that would come in under Rule 702, what he said. To the extent he's saying, I heard these conversations, and yes, Wilson said X. And I used special equipment to hear it, which you don't have. Yeah, I'm not sure that would be qualified as 702. That's based on, I hear these a bunch of times, I listen to it in the quiet room, I put the headphones close to my head so I can hear it. But to go back to why I don't believe that any of this was plain errors, as to the main danger of usurping the jury role, it was emphasized throughout this testimony that Thompson had one understanding of either what they meant or what was said. The defense counsel extensively cross-examined him about this. They had other views. Sometimes he acknowledged that's possible. More significantly, the court emphasized again and again, this is up to the jury to decide. But he was saying in various places, I can understand this because I know other things. I don't believe... I've listened to many, many phone calls that you don't have. I had a confession from... I had these confessions from one of the defendants. I just know other things that you don't know. Unlike in the Hampton case, for example, that recent D.C. case, that really was not underlying what he was doing in this one part. He really was saying, aside from the pronouns and some of the coded words, he really was saying this is either what I understand, that they were saying directly their admissions, or he was explaining the context, for example. He said, for example, when they were referring to... That's what happened at some point. He said, oh, they're referring to the November 11 incident. I don't know. They were referring to the November 11 incident or something like that, right? I'm not sure that that's improper under, again, this court's precedent. He was basing it on his firsthand information. Exactly, his firsthand information, not what the jury had. Well, it was before the jury. In fact, testimony about that November transaction was before the jury. So they knew that. And they could have come to that conclusion if they wanted to. It's argument, but how is that within his knowledge? It isn't. Well, again, that is the kind of testimony... And I don't have to belabor to say that that was OK, but that is the kind of testimony that this court has let in when you're referring to information based on, say, the case agent's firsthand knowledge. So long as he's not introducing hearsay. But let me get to, again... Explain to me how that particular statement was based on his firsthand knowledge of anything. Well, his firsthand knowledge about the transactions between PICA, who was ultimately the informant in this case, and his setting up Brandon Haynes and Joe Papp. But he was testifying about a bunch of words on a phone call. And he didn't have any firsthand knowledge about what anybody meant by those, insofar as they were unclear. That's true, and that is what lay opinion testimony is. You know, my opinion is when they said, yeah, he's the one who set up Batman, that they were referring to Batman means Brandon Haynes, and because they were talking about PICA, they were referring to this other incident. All of that underlying information was before the jury, and they could easily reject it. He was crossed about that. But let me just... To get to why none of this, even the parts of his testimony that shouldn't have come in under Rule 71 are not plain error, I talked about the point where a great deal was done  He was really not, unlike other cases, I don't believe he was imbued with this aura of credibility. There were many instances. But the jury didn't have any choice, right? They asked to actually hear the tape. And so, you know, there's a following instruction that says, you know, you're supposed to make your own judgment. And then what they get is this audio that they can't hear. So what are they left with? But they're left with a lot of evidence of guilt of both of these defendants aside from all of the... either the audio or Thompson's testimony about the audio. If you let me finish my question. Oh, I'm sorry. If you let me finish. Just listen, you know. I mean, they asked for it, so we know that this is something that they want to hear, that they want to make a judgment about. And then they are not given the thing to actually make a judgment on. So don't they have to fall back on relying on the judgment of the agent? Well, we... They heard the audio and then they were entitled to deal with it. If they could hear it. But from what I understand, you really can't hear anything on the audio. So we know they want it. We know they want to exercise an independent judgment. And then when they ask for it, they are not given it. They are given something else. So don't we have to infer from that that they must have had no choice but to rely on the agent's statement? Not necessarily, Your Honor. And again, especially under plain error review, they easily could have said, we've been told again and again, it's our view that counts. Rely on what you heard. We can't hear anything. We're going to throw this whole thing out. Or we heard certain things. And again, when you look at the testimony, both on direct of Thompson and cross of Thompson, some statements were clear that everyone agrees they could hear. So we can presume, again, that the jury could hear those as well. But the jury could easily convict these defendants without considering anything on the audio. Well, that's probably true on the drug issue. But what about the assault and the enchantment issue on the assault? Well, I think it's the case on that as well, Your Honor. They knew without considering anything on the tapes or Thompson's testimony that Pick's name was on these unredacted police reports. They went to the prison. They were circulated, at least to Powell and Gadsden and Dante Edwards and that kind of information. It was also conveyed to other people. Wilson had access to the same paperwork. How do we know that? There was a stipulation that I believe that he had access to that. I don't know that he read that. That his counsel had picked them up as well. All right. We don't know that. We don't know he read it. Okay. Then we know that there's a fight in the gym about a week before the Wilson fight specifically over the fact that- Was Wilson there? There's no evidence. And also, Pitko says that he had no idea why this happened. He was there. And he claims that he had no idea why Wilson beat him up. Well, that's right. So if he had no idea, why would Wilson have an idea? Well, I think certainly there's a lot of testimony that there was a fight in the gym about the fact that Pitko was a snitch, and Pitko was trying to get out of that. Pitko didn't know at the time that this paperwork with his name on it had been released, but he certainly knew. I know, but my point is when he was asked, why did Wilson beat you up, he said, I have no idea. He had no idea. He had no idea, right? He was at that same altercation. In fact, he was the subject of it. He knew they were calling him a snitch. He didn't connect the two. Well, I'm not sure we know that he didn't connect the two. He said, I have no idea. I think, again, the fact that he said, and I later found out this paperwork had been, with my name on it, had been circulated. At least it's a lot weaker, way weaker, without this. It is Thompson's view of the tape. There's one statement on the tape that certainly says, that certainly is helpful to the government's case, but I think it's really a logical inference from the jury to say, the co-conspirators knew that he was a snitch, the paperwork was being circulated, that kind of work. But even this thing where he says, I know he said, that he concluded that he said he choked him rather than something else, right? That was part of the evidence against Wilson on the assault, right? But apparently it wasn't at all clear that he said choked. He just decided that that's what he said after listening to a bunch of other phone calls. I don't believe that evidence is really important to what he was convicted of. He was charged with attempted murder. It certainly would have been probative of that. But he was acquitted of attempted murder. But the jury saw the videotape of the assault, and I think that probably very clearly established that he was assaulted. So I don't think that's the question. It's just the question of the retaliation. I think it was certainly logical. Okay. Thank you. Sorry, my time is up. Thank you. Time is up. We'll give you a minute each for a bubble. Thank you. The one thing I would like to clear up is that on the afternoon of day 8 of the jury trial, during their first day of deliberations, the jury asked to hear the recordings. So they brought them in here. They played the courtroom recording. It was the next day, the morning of day 9 of the jury trial, where they specifically said, no, we don't want to hear the courtroom recording. We want to hear the real recordings, the original recordings of what was said. And I would agree with Your Honor that that implies that they had a hard time understanding. And did the defense lawyer at that point say we should give the recording? We object to? There was no... What happened at that point when the jury asked for this? What did the defense lawyer do? The defense lawyer, well, the government, they didn't have any way of doing it because they had one CD that had all of the calls on it. No, no, you're not answering my question. Mistime? Make a motion to mistime? I mean, what did the defense lawyer do to preserve the point? They objected and they said it was their position that they should not play the original court recordings because the original recordings were not preserved in a way that would make it easy to play for the jury. So we had a CD, apparently a CD, that had all of the recordings on it, and they sat here and they would stop, start, stop, start, not excerpt it out onto one CD so that's all that was on there. And they said they wouldn't be able to go back and recreate what occurred in the jury room by playing this one CD that has all the calls on it, by going to this one spot, play, and then they said, well, we might go too far, there might be things that weren't admitted. I'm sorry if I could just interrupt for a moment. I didn't understand your response. The defense counsel said the original recordings should not be given to the jury? It would be inappropriate because of the way, because they were never preserved. There's no exhibit, there's no, there's just really no way to do it. I'm sorry, so they objected to giving the original recording to the jury? I believe that's what their position was. They did not object to the jury's failure to hear the original recordings. I'm sorry, what did you say? The defense lawyer did not object to the fact that the jury did not get a chance to hear the original recordings. They did not object? Yes. Well, let's see, so Mr. Wannell, who was counsel for Mr. Gadsden, says, Your Honor, those recordings weren't admitted into evidence, they were played in open court, they have a right to review the record to see what was played during trial, but they don't have a right to go back and look at something that's not an exhibit. The court, I agree, Mr. Cavell, counsel for Mr. Wilson, I agree, Mr. Crawford, counsel for Mr. Taylor, I agree. That was their position. So it seems to me the point is forfeit, isn't it? The point that the jury does not get what it asks for. The defense not only waived it, but actually forfeited it. Actually went ahead and said, No, we object to you doing that thing the jury wants. I would disagree with that. You can't complain about it now. Well, I would disagree with that because there was no way for it to be done. Did they ask for mistrial on that basis? They did not ask for mistrial. Okay, so isn't that waived? I mean, you know, the jury asked for it. You can't complain now that the jury wasn't given the thing that they asked for when it was defense itself that objected to having the jury give them the thing they asked for. Well, the problem is there was no way to – but the problem goes back one step further then in terms of the trial. At the time of the trial, did anybody say that they should have had the original recordings? They did have the original recording at the time of the trial, right? The original recordings were merely played over the audio system. There was no CD exhibit, exactly. Did anybody object and say, hey, we need an exhibit? I believe they did. I do not have that site for you, but I believe they did. On the morning of day nine, Mr. Cavell refers back to when he said, I said this was going to be a problem and it's a problem. I was not able to find where he said that, so it appears that that did occur at some point earlier in the record. It would be helpful if you could send us a letter about that. I will look for that. Because, again, what I'm concerned about is that I don't have it. I don't know what I'm reviewing. I agree, and, Your Honor, I've listened to them with headphones, and I had a hard time hearing what was being said and basically had to rely on Officer Thompson's interpretation of what was said and what those words meant. Well, it isn't so troublesome to listen to somebody to say, you know, these are the words that were said. That's one thing. But that's not really what your complaint is. Your major complaint is that he was then interpreting what the words were that were said. It is actually both. It is actually both. Because the audio is so difficult to hear and Officer Thompson, you know, says I listened to these hundreds of hours, I've listened to them multiple times in a super quiet room with better equipment, so I'm better able to tell you what words were specifically said. So that kind of falls into the expert area, that I have some specific expertise in listening to this and understanding what's said. And then the other side of the coin is that he's saying, well, this is what was said, and then this is what they meant by those words. So it is sort of a dual issue here. And I've gone three minutes. Mr. Ballas gets a minute? Is that my understanding? Sure. Okay. Thank you. The case is argued with ten minutes. The case is argued. The case is argued. We'll next hear argument in. United States versus Brooks. The case is argued. The case is argued. The case is argued.
judges: Kozinski, Berzon, Ikuta